Case 1:20-mj-02374-TMD   Document 3   Filed 09/25/20   Page 1 of 11

FILED ___ ENTERED
____ LOGGED _____ RECEIVED

9:58 am, Sep 25 2020
AT BALTIMORE
CLERK, U.S. DISTRICRT COURT
DISTRICT OF MARYLAND
BY _____Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF A 2017 INFINITI AUTOMOBILE BEARING MARYLAND REGISTRATION 2AP2016 AND VEHICLE IDENTIFICATION NUMBER JN1EV7EL3HM553784** | Case No.  1:20-mj-2374 TMD _____ |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Khrystina Pindle, a Special Agent (SA) with the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

### I. PURPOSE OF THIS AFFIDAVIT

1. I submit this affidavit in support of a warrant authorizing the search of a 2017 Infiniti automobile, bearing Maryland registration 2AP2016 and vehicle identification number (VIN) JN1EV7EL3HM553784, and registered to Jerold M. GILLIAM, 1516 Mountmor Court, Baltimore, MD 21217 (hereinafter "TARGET VEHICLE ").

2. Based upon my training and experience, I submit that there is probable cause to believe that Jerold M. GILLIAM uses the TARGET VEHICLE in furtherance of criminal activity, including violations of Title 21 of the United States Code § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (the "SUBJECT OFFENSE").  I further submit that there is probable cause to believe that the TARGET VEHICLE contain fruits, evidence, and instrumentalities, as more fully described in Attachment B, of said SUBJECT OFFENSE.

### II. AFFIANT BACKGROUND AND EXPERTISE

3. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States

1

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of United States Code Title 18.

4.   I am a Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA") and have been employed with the DEA since May 2019. I am currently assigned to the Baltimore District Office, Strike Force Group 1, which investigates DTOs and their ties to violence. As a Special Agent of the DEA, I am authorized to investigate violations of the laws of the United States and am a law enforcement officer with the authority to execute arrest and search warrants under the authority of the United States. My training consisted of 16 weeks of Basic Agent Training at the DEA Academy in Quantico, Virginia. During that time, I received training in narcotics investigations to include physical and electronic surveillance techniques, legal statutes and procedures, money laundering techniques, asset identification, forfeiture and seizure, and confidential source management.

5.   Prior to my employment with the DEA, I was employed as a Special Agent with the Federal Bureau of Investigation ("FBI") in San Francisco, California for approximately 15 months. Prior to my employment with the FBI, I was a graduate student at Webster University, where I earned a master's degree in International Relations.

6.   During my time as a law enforcement officer, I have participated in multiple investigations involving drug trafficking to include the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, the execution of search and seizure warrants, and the recovery of substantial quantities of narcotics.

7.   Through training, education, experience and conversations with other narcotics investigators, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such

drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the actions, traits, habits, and terminology utilized by drug traffickers, the manner in which drug traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, methods of money laundering used to conceal the nature of proceeds, and other means to facilitate their illegal activities and thwart law enforcement investigations.

8. Based upon that training and experience, I have learned the following:

a. Drug traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. These items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. Drug traffickers often have several residences decreasing the likelihood of detection by law enforcement;

b. Drug traffickers may use computers or other electronic storage media, including smart phones, to store the records of documents listed in paragraph a;

c. Drug traffickers maintain on hand large amounts of cash to maintain and finance their narcotics business, which is typically concealed in their residences or vehicles along with financial instruments and evidence of financial transactions relating to narcotics trafficking activities;

d. Drug traffickers use cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information stored on these devices;

e. Drug traffickers commonly possess firearms and other weapons to protect and secure their narcotics and money from loss to law enforcement agents or other members of the criminal element that are motivated by greed; and

f. Drug traffickers commonly possess packaging material, cutting agents,

digital scales, and other items used in the preparation and packaging of controlled substances.

      g.    Drug traffickers commonly use vehicles to conceal and transport ledgers, packaging materials, cutting agents, digital scales, illegal drugs, proceeds from illegal drug sales, and other items associated with illegal drug trafficking. These vehicles are often purchased with illegal drug proceeds and are often registered in the names of other persons to conceal the identity of the drug trafficker who uses the vehicle.

9. Because this affidavit is being submitted for the limited purpose of establishing probable cause to search the TARGET VEHICLE, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and intercepted conversations, as well as conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based upon my review of the audio recordings.

### III. PROBABLE CAUSE

10. In July 2019, DEA Strike Force 1 ("SF1") began investigating multiple violent drug trafficking organizations (DTOs) operating in the western section of Baltimore City. Based on evidence gathered to date, agents determined that the DTOs operate street-level shops and are believed to commit acts of violence associated with their drug activity. One of the DTOs under investigation is the "Bullseye" DTO. Investigators identified Jerold GILLIAM as the leader of the Bullseye DTO. Bullseye DTO operates in the geographic area of west Baltimore known as Penn-North.

11. Based on information developed during this and other investigations, the TARGET VEHICLE was identified and utilized by GILLIAM in facilitation of the Bullseye DTO's drug

4

trafficking operations. Investigators observed, via surveillance and court-authorized GPS tracking, GILLIAM operating the TARGET VEHICLE between September and November 2019. Observations regarding the vehicle were consistent with drug trafficking when viewed in connection with intercepted wire and electronic communications, surveillance of other individuals and locations, controlled purchases from GILLIAM's associates, and information from confidential sources.

12. On November 20, 2019, the Honorable Deborah L. Boardman, United States Magistrate Judge for the District of Maryland, authorized search warrants for various places, persons, and vehicles associated with the Bullseye DTO, including both GILLIAM and the TARGET VEHICLE.[1] Upon execution of the search warrant the following day, investigators seized $5,299 in cash and a cell phone from the vehicle. Following the search, investigators returned the vehicle to GILLIAM's paramour Tiffany Nesbitt. On the same date, November 21, 2019, investigators recovered from GILLIAM's person fifty (50) gelatin capsules containing fentanyl, which was confirmed via chemical analysis.

13. On August 25, 2020, a federal grand jury in the District of Maryland returned an indictment charging various drug trafficking and firearms offenses against members associated with the Bullseye DTO, including GILLIAM. *See United States v. Gilliam, et al.*, JKB-20-0269 (D. Md.). The charges arise from information developed during the aforementioned investigation, which revealed GILLIAM's role as the leader of the Bullseye DTO who supplied the organization with controlled substances and controlled the operation through a subordinate in charge of

---

[1] Between September and November 2019, the TARGET VEHICLE was assigned a different Maryland registration identifier but was registered to GILLIAM at an Owings Mills, Maryland address.

directing day-to-day street sales and related tasks. On the same date, the United States District Court for the District of Maryland issued arrest warrants for the charged defendants.

14. Investigators from SF1 have maintained regular communications with a confidential source (CS-1), who provided credible information in 2019 that aided in identifying various Penn-North investigative targets, including GILLIAM, and furthering the investigation into 2020. Recently, CS-1 advised that GILLIAM has been overseeing the open air drug shop operating in the vicinity of Druid Hill Avenue and Baker Street in the Penn-North area of west Baltimore. CS-1 stated that GILLIAM has been operating in that area as recently as September 11, 2020.

15. On September 14, 2020, at approximately 8:40 a.m., agents located GILLIAM located and arrested him in a park in Penn North, at the intersection of Woodbrook Avenue and W. North Avenue. This intersection lies within the geographic borders of the area in which investigators observed drug trafficking activities associated with GILLIAM and the Bullseye DTO.[2] Additionally, agents located and arrested GILLIAM's indicted co-conspirator, Welton WHITTINGTON Jr.[3], a few blocks from GILLIAM the same morning. Agents found WHITTINGTON Jr. standing on a street corner in possession of two cellular phones, $90.35 in cash, and a single clear gel capsule containing suspected controlled substances. Investigators know

---

[2] One of the November 2019 search warrant targets was 501 Cumberland Street in Baltimore, which investigators determined to be used as a location used for storing controlled substances, and surveillance showed various Bullseye DTO members engaged in suspected hand-to-hand transactions. Surveillance also showed GILLIAM meeting with associates in front of this residence and, on at least one occasion, receiving cash from individuals suspected to be selling controlled substances in the same area. This location is approximately 400 feet from the Woodbrook and W. North intersection.

[3] Investigators identified WHITTINGTON Jr. as a street hitter for the Bullseye DTO, conducting hand-to-hand CDS transactions for the DTO. Investigators intercepted communications from WHITTINGTON Jr. discussing DTO operations in fall 2019. WHITTINGTON Jr. was also indicted on August 25, 2020 with GILLIAM and others.

that it is common for those involved in drug trafficking to be in possession of multiple cellular phones to facilitate DTO operations, often using one phone to communicate with sources of supply and/or DTO leaders, and another phone to communicate with customers.

16. Upon searching GILLIAM's person incident to his arrest, investigators located a black Infiniti key fob. Investigators located the Infiniti—the TARGET VEHICLE—several blocks away from the arrest site, in the 1600 block N. Gilmor Street. The key fob activated the emergency alarm for the vehicle. Upon locating the vehicle, investigators requested a Baltimore Police Department canine to conduct a free air sniff for narcotic odor, with negative results. Investigators asked GILLIAM for consent to search the vehicle. GILLIAM refused and said that all he had in the car was a "little bit of money" and if investigators wanted to search his car to "do your job and get a warrant." Investigators secured the TARGET VEHICLE and transported it to a secure location, pending the authorization of a search and seizure warrant, where it remains as of the date of this affidavit.

17. Based on the aforementioned observations and events, including information regarding GILLIAM's drug trafficking in 2019 and as recently as September 2020, investigators believe GILLIAM continued to utilize the TARGET VEHICLE in support of drug trafficking. Based upon training and experience, as well as prior observations of GILLIAM and the TARGET VEHICLE, investigators believe that GILLIAM likely used the vehicle to stash CDS and/or proceeds from CDS sales, CDS packaging material, and/or cell phones.

## IV. CONCLUSION

18. Based on the foregoing, I submit that there is probable cause to believe that within the **TARGET VEHICLE** are fruits, evidence, and instrumentalities of the above-described SUBJECT OFFENSE.

19. WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for the **TARGET VEHICLE**, and authorize the search and the seizure of items described in Attachment B, which constitute fruits, evidence, and instrumentalities of violations of 21 U.S.C. § 846. Further, there is good cause for the Court to authorize the requested search at any time of the day or night. Because the **TARGET VEHICLE** is already in law enforcement's custody, no further prejudice will result to any person as a result of this request.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*SA Khrystina Pindle*
Special Agent Khrystina Pindle
Drug Enforcement Administration

Subscribed and sworn to before me this 24 day of September 2020.

Thomas M. DiGirolamo
United States Magistrate Judge

1:20-mj-2374 TMD

## **ATTACHMENT A**

## **The Target Vehicle**

A 2017 Infiniti automobile bearing Maryland registration 2AP2016 and vehicle identification number (VIN) JN1EV7EL3HM553784, which is registered in the name of Jerold GILLIAM at 1516 Mountmor Court, Baltimore, MD 21217.

1

## ATTACHMENT B

1. Controlled substances;

2. Paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution, to include, scales, plastic bags, gelatin capsules, vials, cutting agents (such as mannitol and quinine), and kilogram wrappers;

3. Currency or currency equivalents;

4. Firearms and ammunition;

5. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

6. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit cards; credit card records; pre-paid credit cards; green dot cards and documents relating thereto; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

7. Records that identify other co-conspirators and gang members, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones/cellphones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

8. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

9. Identification documents;

10. Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

      11.    Indicia of occupancy, rental, control, and/or ownership of the vehicle, including keys, photographs, lease agreements, rental receipts, canceled checks, titles, registration documents, and other documents;

      12.    Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof; and

      13.    Cellphones and related records.